1

2

3

4

5

6

# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARACELI V. ARRES, | CASE NO. 1:11-cv-00493-SMS |
| Plaintiff, | |
| v. | ORDER AFFIRMING AGENCY'S DENIAL OF BENEFITS AND ORDERING JUDGMENT FOR COMMISSIONER |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | |
| Defendant. | |
| _____ / | |

Plaintiff Araceli V. Arres, by her attorneys, Law Offices of Lawrence D. Rohlfing, seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits under Title II of the Social Security Act (42 U.S.C. § 301 *et seq.)* (the "Act"). The matter is currently before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder, United States Magistrate Judge. Following review of the record as a whole and applicable law, this Court affirms the agency's determination to deny benefits to Plaintiff.

I.      **Administrative Record**

   A.      **Procedural History**

        Plaintiff was insured under the Act through June 30, 2007. On April 27, 2007, Plaintiff filed for disability insurance benefits, alleging disability beginning January 28, 2003. Her claim was initially denied on August 23, 2007, and upon reconsideration on January 17, 2008. Plaintiff appeared and testified at a hearing on May 27, 2009. On September 23, 2009, Administrative

1

1  Law Judge Michael J. Kopicki denied Plaintiff's application.  Plaintiff appealed to the

2  Administrative Council, which denied review.

3       **B.       Agency Record**

4       Plaintiff (born January 28, 1957) speaks no English.  She came to the United States in

5  about or about 1980.  Plaintiff attended school in Mexico through the sixth grade.  She has a valid

6  driver's license and is able to drive, although turning her head was difficult and painful.

7       Plaintiff last worked sorting cherry tomatoes at a packing house.  On September 8, 2002,

8  while helping cover a tomato container with a tarp, she fell from a ladder, injuring her stomach,

9  right ankle, left wrist, and knees.  On January 28, 2003, she fell on the stairs at the packing house,

10 possibly because her recently injured knee buckled, and injured her neck, back, and knees.

11      Plaintiff testified that she experiences throbbing back pain and tension from her neck

12 down that affects her hips and causes her to lose her balance.  She has declined surgery on her hip,

13 but takes pain medication.  Plaintiff also testified that her pain and inability to function caused

14 anger and depression, for which she took Effexor.  She had not received counseling or therapy nor

15 had any doctor recommended it.

16      Although Plaintiff no longer went to physical therapy, she was able to do the exercises at

17 home.  Sometimes they helped but sometimes they increased her pain.

18      On a typical day, Plaintiff rose at 6:30 a.m.  If her granddaughter was staying with her,

19 Plaintiff took her to the school bus stop.  In the course of a day, Plaintiff would prepare one meal,

20 leaving the others to other family members.  She sometimes made sandwiches or cooked a

21 chicken.  If she tackled a recipe that took time, Plaintiff would do it little by little.  She cleaned

22 house with the help of other family members, sweeping and washing her own clothes.  She liked

23 to read and watch television but despite her children's encouragement had not learned to use the

24 computer.  She also fed her pet cockatiels and parakeets, which lived in a large cage outdoors.

25 Plaintiff liked to garden, but most of her plants had died.  She attended church most Saturdays.

26 She had a few friends.  According to her application for benefits, she is able to take care of all her

27 personal needs.

28 ///

1    Plaintiff testified that she could walk about 25 minutes, could stand for 30-45 minutes, and

2  could sit no more than an hour. Although she had difficulty lifting things from the floor, Plaintiff

3  thought she could lift about seven pounds from a table.  She rested for 15-20 minutes three or four

4  times daily. She could concentrate for an hour before needing to change positions.

5    **Daughter's letter.**  On April 17, 2009, Plaintiff's daughter, Michelle Hernandez, sent a

6  letter to Plaintiff's attorney setting forth changes in Plaintiff's life following her accident.

7  Because of her pain, Plaintiff was no longer active and, because she could not kneel on the

8  ground, could not garden as she used to.  She no longer took long walks.  Traveling was painful.

9  Plaintiff is unable to cook as she used to, but must take breaks that greatly increase the time

10 needed to cook big meals.  Although she previously made tortillas all the time, following her

11 accident, Plaintiff only made them once or twice a year.  Plaintiff drove less and had lost her

12 independence.  She had become depressed and reliant on pain medication.

13    **Concentra.**  Theodore Johnstone, M.D., treated Plaintiff at Concentra Occupational

14 Medical Center following her accident at work.  The record includes his notes from September 8,

15 2002, through March 4, 2003.  Following Plaintiff's fall from a ladder, Johnstone diagnosed a

16 mild sprain of the right ankle and mild contusion on the left calf. He prescribed ibuprofen and

17 modified work duties (no climbing ladders, no prolonged standing, and no lifting over ten

18 pounds).  He later noted Plaintiff's knee injuries, and diagnosed mild strains of the left wrist, both

19 knees, and the right foot, and switched Plaintiff's prescription from ibuprofen to Celebrex.

20    Cicely Roberts, M.D., reviewed x-rays and concluded that the alignment of Plaintiff's

21 cervical spine was maintained and there was not evidence of fracture.  X-rays of Plaintiff's right

22 and left knees showed no fracture or dislocation and intact soft tissue planes.  Steven Schumann,

23 M.D., confirmed that the x-rays appeared normal but directed that Plaintiff be assigned light work

24 with 90% sitting and no kneeling or squatting.

25    At a follow-up appointment on January 30, 2003, Plaintiff told Dr. Johnstone that she was

26 in so much pain she did not report to work the day before.  Johnstone observed a very stiff and

27 painful cervical spine and noted that Plaintiff held her head "very, very still."  AR 413.  Although

28 flexion and extension were unchanged. she was able to rotate only a few degrees.  Johnstone

3

1  diagnosed cervical spine strain and bilateral knee strains and abrasions.  X-rays administered on

2  February 6, 2003, showed no abnormalities of the cervical spine but revealed "old" spondylosis in

3  the para-articularis of L-5, grade I spondylolisthesis of L-5 on S-1, and degenerative disc at L-5,

4  S-1.  By February 13, 2003, Plaintiff had experienced a physical therapy session and already felt

5  better.  The range of motion of her neck had improved .  Although her knees were tender, she had

6  no trouble walking without limping.  On March 3, 2003, Dr. Johnstone transferred Plaintiff's care

7  to a physiatrist.

8  　　　When the pain in Plaintiff's left knee remained at the end of October 2003, Dr. Johnstone

9  referred Plaintiff to orthopedist Cyril W. Rebel, M.D., who also diagnosed left knee strain but

10  referred Plaintiff for an MRI to rule out a meniscal tear.

11  　　　**Dr. Azevedo.**  The record includes treatment notes of physiatrist Michael Azevedo, M.D.,

12  from July 23, 2003, to January 8, 2009.[1]  Plaintiff saw Azevedo every two to three months.

13  Azevedo described Plaintiff as having chronic intractable mid and low back pain.  Although

14  medications usually controlled Plaintiff's upper and lower back pain, she occasionally

15  experienced severe exacerbations of pain that did not respond to medication and kept Plaintiff

16  from sleeping.  Several times a week, Plaintiff experienced intractable right-sided gluteal and

17  thigh pain.  Azevedo prescribed a variety of pain medications and anti-inflammatory drugs in his

18  attempt to provide reliable pain control.  He also recommended a daily routine of exercise and

19  stretching.

20  　　　**Physical therapy.**  The record includes daily notes regarding Plaintiff's physical therapy

21  at Madera Community Hospital from June 6  through September 30, 2003.  Her therapist noted

22  improvement during the course of therapy.  Although Plaintiff also noted improvement, she was

23  disappointed that the therapy did not completely relieve her pain and that she still required pain

24  medication.  Plaintiff was discharged with a daily exercise routine to be performed at home.

25  ///

26  ///

27

28  　　　[1] Although individual notes reflect changes in medications and other treatments, the discussion of
Plaintiff's condition and complaints changes little from one note to the next.

4

1    In a discharge report to Dr. Azevedo, physical therapist Ben Brahim characterized Plaintiff

2  as having reached the goals of therapy.  Brahim described Plaintiff's subjective response to

3  treatment:

4        The patient indicated through the interpreter, since she speaks only Spanish, that
         her condition has improved.  That she has practically no back pain but at times she
5        does experience brief recurring pain in the cervical and cervicothoracic spine but
         the pain does not last for long and patient does not take any pain medication.  The
6        right knee condition is stable and the patient has no pain in the right knee.  She did
         stop doing the exercises for quite awhile for the reason that the patient finds herself
7        doing too much exercise for her neck, back, right shoulder and right knee.  The
         patient has been encouraged to try at least every other day to exercise her knees.
8
         AR 366.
9
   Brahim also described Plaintiff's objective response to treatment:
10
         The patient's treatment has been described above.  The progress also had been
11       explained in the patient's subjective with the inconsistent residual discomfort
         which does not impair patient function and does not aggravate to a high level of
12       pain.  The patient should be able to maintain the progress achieved.  Right knee
         range of motion is within normal findings.  Cervical mobility is normal all
13       movements are tolerated without a problem.  There is no mechanical block.
         Lumbar mobility is normal.  The only residual problem as per patient's statement is
14       occasional neck pain and the patient does not know what causes this pain but the
         pain does not last for too long and does not require any pain medication.
15
         AR 366.
16
   **Dr. Sabian.**  Marcia E. Sabian, M.D., was Plaintiff's primary care physician.  On
17
   November 1, 2007, Dr. Sabian prescribed Effexor XR in response to Plaintiff's reports of anxiety
18
   and depression.
19
   **Dr. Ovadia.**  On April 12, 2004, orthopedist Daniel N. Ovadia, M.D., examined Plaintiff
20
   and evaluated her medical records for state disability benefits.  He opined that her condition was
21
   permanent and stable, and recommended her for vocational retraining.
22
   Ovadia administered x-rays of Plaintiff's cervical and lumbar spine, which indicated that,
23
   except for slight straightening, Plaintiff's cervical spine was normal, but that her lumbar spine x-
24
   rays revealed bilateral spondylolysis at L5-S1 with Grade I-II spondylolisthesis.  There was slight
25
   movement on extension and flexion, and advanced disc space narrowing.
26
   He concluded that the pain in Plaintiff's cervical spine was intermittent and minimal to
27
   slight; left knee, intermittent and slight; and right knee, intermittent and minimal.  He
28

1   characterized Plaintiff's lumbar spine pain as "constant and slight, frequently becoming slight to

2   moderate, occasionally to intermittently increasing to moderate in intensity. Accordingly, Ovadia

3   opined that Plaintiff's lumbar spine residuals precluded heavy work and very prolonged sitting

4   and standing, and that left knee residuals precluded repetetive kneeling, squatting, and crawling.

5          Ovadia recommended a cervical MRI scan to resolve the inconsistencies between

6   Plaintiff's subjective complaints and the findings on the x-rays.  He recommended ongoing

7   prescriptions of anti-inflammatory drugs and mild analgesics for continued treatment of Plaintiff's

8   lumbar spine, and suggested that she might ultimately require surgery.  He discouraged further

9   physical therapy or chiropractic treatment as unlikely to be productive.  Finally, he recommended

10  a three-phase bone scan and if the scan was abnormal, arthroscopic knee surgery at Plaintiff's

11  option.

12         On April 28, 2004, Ovadia prepared a supplemental report following review of the MRI

13  results.  Because the MRI confirmed the x-ray results, he concluded that no work restrictions were

14  required to address Plaintiff's complaints of cervical spine pain.  But the bone scan results of

15  Plaintiff's knees were not reconcilable with Ovadia's physical examination.  Ovadia affirmed his

16  earlier recommendation for permanent factors of disability for both knees, and recommended

17  provision of prescription anti-inflammatory medication for the right knee and possible

18  arthroscopic surgery for the left knee.

19         **Dr. Nelson.**  Orthopedist Russell Nelson, M.D., reviewed Plaintiff's medical records and

20  Dr. Ovadia's report for attorney Daniel Keeling.  Nelson agreed with Ovadia that Plaintiff's neck

21  pain was subjective and that her lumbar spine might require surgery.

22         On July 30, 2003, Nelson reported on his physical examination of Plaintiff.

23  Characterizing her condition as permanent and stationary, he reported that Plaintiff experienced

24  occasional slight neck pain and "[i]ntermittent slight low back pain, moderate with twisting and

25  turning and bending, moderate to severe with attempts at heavy lifting." AR 194.  Objective

26  factors of disability included loss of lumbar motion; evidence of unstable spondylolisthesis at L5-

27  S1, evidence of retrolisthesis at L4-5; loss of motion; and residual anterior tenderness.  Nelson

28  opined that Plaintiff's lumbar disability precluded heavy work, but that her cervical disability

6

1  rated subjectively.  She was unable to perform repetetive kneeling and bending of both knees.

2  Nelson recommended medication and therapy for Plaintiff's knees and neck, and continued

3  treatment of her lumbar spine including MRI scans, discograms, and possibly surgical treatment.

4  In any event, because of the twisting and turning required in her prior job, Plaintiff could not

5  return to it and required rehabilitation.

6      **Dr. Mehdi.**  On June 22, 2007, Abbas Mehdi, M.D., examined Plaintiff and prepared a

7  report as the agency's medical consultant, diagnosing total body pain and arthritis.  By all

8  measures, Plaintiff's condition was within normal limits.  Mehdi opined:

9          The claimant can lift and carry 100 pounds occasionally and 50 pounds frequently.
           The claimant can stand and walk six hours out of an eight hour day with normal
10         breaks.  The claimant can sit without restriction.  No exertional limitations.

11     AR 207.

12      **Dr. de la Rosa.**  C. I. de la Rosa, an agency physician, prepared a physical residual

13  functional capacity assessment.  Dr. de la Rosa opined that Plaintiff could lift and carry fifty

14  pounds occasionally, and 25 pounds frequently; could stand or walk six hours in an eight-hour

15  work day; could sit about six hours in an eight-hour workday; had unlimited ability to push and

16  pull; had no postural limitations except that she should never climb ladders, ropes or scaffolds;

17  and had no manipulative limitations except that she had limited ability to reach in all directions.

18  The doctor commented, however, "Examining MSS for heavy due to little objective evidence on

19  exam, but with findings on XR & taking pain into consideration, medium seems most

20  appropriate."  AR 213.

21      **Vocational expert.**  Vocational expert Kenneth Ferra testified that Plaintiff's prior work

22  as a sorter was light and unskilled, and as a farm worker, medium and unskilled.  For the first

23  hypothetical question, the ALJ asked Ferra to assume an individual aged 47 to 49 years old with a

24  sixth-grade education in Mexico who is not literate in English and cannot communicate in

25  English.  The hypothetical individual can lift 50 pounds occasionally ansd 25 pounds frequently;

26  can stand or walk six hours in an eight-hour work day; can sit six hours in an eight-hour work day;

27  but can only occasionally lift above shoulder level bilaterally; should never climb ladders, ropes,

28  or scaffolds; and should only occasionally kneel, crouch, or crawl.  Ferra opined that such a

1   person could perform Plaintiff's prior work.  If the ALJ added a condition of no repetitive turning

2   at the waist, Ferra opined that he or she could still do Plaintiff's prior work.

3          For the second hypothetical question, the ALJ directed Ferra to also assume the

4   hypothetical individual from question one except that he or she could lift 20 pounds occasionally

5   and ten pounds frequently, and should not do repetitive twisting at the waist level.  Ferra again

6   opined that such a person could perform Plaintiff's prior work.  Representative positions for the

7   second hypothetical individual would include packing line worker (No. 753.687-038, 30,000

8   positions in California) and assembler (No. 712.687-010, 30,000 positions in California).  The

9   hypothetical individual could also work as a Cashier II (No. 211.462-010, 113,000 positions in

10  California, 11,300 positions in California for non-English speaking persons).  For all three

11  positions, about ten times as many positions are available at the national level.

12         For the third hypothetical question, the ALJ directed Ferra to assume the same individual

13  previously described, but with the ability to lift seven pounds from table level, and no weight from

14  the floor; could carry no weight; could walk for no more than 45 minutes; could stand for no more

15  than 30-45 minutes at a time; could sit for no more than one hour at a time before needing to

16  change positions.  Ferra opined that no job as would be available for such an individual.

17         Plaintiff's attorney, Melissa Proudian, then asked Ferra whether jobs would be available

18  for either the first or second hypothetical individual if he or she required unscheduled rest breaks

19  three or four times daily for 15-45 minutes.  Ferra responded that no jobs would be available for

20  such an individual.

21         Ms. Proudian then directed Ferra to assume an individual who had a light residual

22  functional capacity with regard to lifting, but who could not do prolonged sitting or standing;

23  whose left knee residuals would prevent repetitive kneeling, squatting, or crawling; and who

24  would need a sit-stand option.  Ferra opined that such an individual could not do Plaintiff's prior

25  work, but that about 2825 of  the cashier II positions and about 6,000 of the assembler positions

26  would include a sit-stand option.

27  ///

28  ///

1   II.   **Legal Standards**

2          To qualify for benefits, a claimant must establish that he or she is unable to engage in

3   substantial gainful activity because of a medically determinable physical or mental impairment

4   which has lasted or can be expected to last for a continuous period of not less than twelve months.

5   42 U.S.C. § 1382c (a)(3)(A).  A claimant must demonstrate a physical or mental impairment of

6   such severity that he or she is not only unable to do his or her previous work, but cannot,

7   considering age, education, and work experience, engage in any other substantial gainful work

8   existing in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

9          To encourage uniformity in decision making, the Commissioner has promulgated

10  regulations prescribing a five-step sequential process for evaluating an alleged disability.  20

11  C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f).  The process requires consideration of the following

12  questions:

13          Step one:     Is the claimant engaging in substantial gainful activity?  If so, the
                            claimant is found not disabled.  If not, proceed to step two.
14
                Step two:     Does the claimant have a "severe" impairment?  If so, proceed to
15                            step three.  If not, then a finding of not disabled is appropriate.

16          Step three:   Does the claimant's impairment or combination of impairments
                            meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P,
17                            App. 1?  If so, the claimant is automatically determined disabled.  If
                            not, proceed to step four.
18
                Step four:    Is the claimant capable of performing his past work?  If so, the
19                            claimant is not disabled.  If not, proceed to step five.

20          Step five:    Does the claimant have the residual functional capacity to perform
                            any other work?  If so, the claimant is not disabled.  If not, the
21                            claimant is disabled.

22  *Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

23          The ALJ found that Plaintiff had not engaged in substantial gainful activity since the

24  alleged onset date of January 28, 2003, through the date on which she was last insured, June 30,

25  2007.  Her severe impairment was lumbar degenerative disc disease, which neither met nor

26  equaled the requirements of a listed impairment.

27          Plaintiff retained the residual functional capacity to lift and carry twenty pounds

28  occasionally and ten pounds frequently; to stand or walk six hours and to sit six hours in an 8-hour

1 work day; and occasionally reach overhead bilaterally, kneel, crouch, and crawl, but never climb

2 ladders, ropes or scaffolds, or perform repetitive twisting at waist level.  Plaintiff was able to

3 perform her past relevant work as a sorter,

4 **III.     Scope of Review**

5       Congress has provided a limited scope of judicial review of the Commissioner's decision

6 to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

7 a court must determine whether substantial evidence supports the Commissioner's decision.  42

8 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*,

9 402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d

10 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept

11 as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.  The record as a whole must

12 be considered, weighing both the evidence that supports and the evidence that detracts from the

13 Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the

14 evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g.,*

15 *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's

16 determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if

17 the ALJ's findings are supported by substantial evidence.  *See Sanchez v. Secretary of Health and*

18 *Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).

19 **V.     Michelle Hernandez's Letter**

20       Plaintiff contends that reversal and remand is required since the ALJ failed to articulate any

21 reason for disregarding the letter that Michelle Hernandez, Plaintiff's daughter, wrote to Plaintiff's

22 attorney.  The Commissioner replies that since Hernandez's statements did little more than echo

23 Plaintiff's subjective complaints, which the ALJ found to be not fully credible, the ALJ did not

24 need to address the letter separately.

25       "Lay testimony as to a claimant's *symptoms* is competent evidence which the Secretary

26 must take into account, unless he ultimately determines to disregard such testimony, in which case

27 'he must give reasons that are germane to each witness.'" *Nguyen v. Chater*, 100 F.3d 1462, 1467

28 (9th Cir. 1996), *quoting Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993).  Friends and family

1  members who are in a position to observe the claimant's symptoms and daily activities are

2  competent to testify about their observations of the claimant's condition. *Dodrill*, 12 F.3d at 918-

3  19. An ALJ's disregard of the testimony of friends and family members violates the regulations,

4  which provide for consideration of the observations of non-medical sources regarding the effects

5  of the claimant's impairments on his ability to work. *Id., citing* 20 C.F.R. § 404.1513(e)(2).[2] *See*

6  *also Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987). When a claimant alleges symptoms

7  that are not supported by medical evidence in the record, the agency directs the adjudicator to

8  obtain information about those symptoms from third parties likely to have such knowledge. SSR

9  88-13. The ALJ must give "full consideration" to such testimony. Id.

10          The theme of Hernandez's letter, which is included in the agency record at AR 160-161, is

11  the activities that Plaintiff became unable to do, or to do as well, following her accident. In a

12  sentimental, daughterly tone, Hernandez asserts that Plaintiff was formerly active and independent

13  but now has given up gardening and cooking, struggles to drive, takes much longer to cook big

14  meals for her family, has become depressed, and takes medication to control her pain. As the

15  Commissioner points out, Hernandez's letter sets forth no further information than that to which

16  Plaintiff herself testified. As the Commissioner also points out, the ALJ found that Plaintiff's

17  testimony in this regard lacked credibility:

18          There are some factors in the record that weigh against the claimant's credibility.
            First of all, claimant testified that physical therapy did not help her condition at all.
19          However, the record reported significant improvement in the claimant's pain as a
            result of physical therapy. Also, the claimant was not fully compliant with her
20          doctor's request that she perform exercises and stretching activities at home. She
            had an exaggerated pain response on several examinations. Furthermore, the
21          claimant performs a wide range of activities of daily living as discussed above.

22          AR 18.

23          The Court agrees that Hernandez's letter does little more than restate Plaintiff's subjective

24  complaints.

25          In making his determination, the ALJ also focused on the inconsistency between records

26  provided by the physicians and therapists who treated Plaintiff immediately following her

27

28          [2] The relevant section is now designated 20 C.F.R. § 1513 (d)(4).

1  accidents and the reports of Dr. Azevedo, whose credibility the ALJ also questioned.  The record

2  supports the ALJ's analysis.  Although Dr. Johnstone and Dr. Rebel took multiple steps to ensure

3  that Plaintiff's injuries were not more severe, both ultimately diagnosed Plaintiff with mild

4  strains, in addition to bruises and contusions.  On February 13, 2003, less than a month after the

5  second accident and following a single session of physical therapy, Plaintiff reported that she

6  already felt better.  Her range of motion had improved; she walked easily without limping.  By the

7  beginning of March, Dr. Johnstone referred Plaintiff to Dr. Azevedo, a physiatrist.  Dr. Azevedo

8  ordered physical therapy, from which Plaintiff was discharged on September 30, 2003, having

9  reached the objectives of the therapy.  Although Plaintiff was disappointed that she was not

10  completely free of pain, she concurred that her condition had improved, that she had very little

11  pain, and that the pain was not bad enough to require pain medication.  Therapist Brahim

12  observed that Plaintiff's minor residual pain did not impair her function and that the mobility of

13  Plaintiff's knees and cervical and lumbar back were within normal ranges.  Nonetheless, Plaintiff

14  continued to see Dr. Azevedo and continued to complain to him of pain.  Dr. Azevedo continued

15  to prescribe pain medication.

16      Examining Plaintiff for workers' compensation purposes in April 2004, Dr. Ovadia found

17  little objectively wrong but ordered x-rays since his objective findings were inconsistent with

18  Plaintiff's subjective complaints.  Although the x-rays confirmed that little was wrong with

19  Plaintiff's neck, because of disc degeneration in Plaintiff's lumbar spine, Ovadia restricted

20  Plaintiff from heavy work and prolonged sitting.  He recommended Plaintiff for vocational

21  training that would enable her to find an appropriate job.  Dr. Nelson, who reviewed Ovadia's

22  opinion on behalf of attorney Daniel Keeling, concurred with Ovadia's opinion, finding that the

23  only remaining problem was Plaintiff's subjective reports of discomfort that did not impair her

24  function or require pain medication.  After examining Plaintiff in 2007, Dr. Mehdi found

25  Plaintiff's condition to be within normal limits and imposed no exertional limitations.

26      In short, objective medical evidence supported the ALJ's conclusion that Plaintiff's

27  assertions of debilitating pain were grossly inconsistent with objective medical evidence and

28  ///

1  lacked credibility.  Any error in the ALJ's failure to explicitly reject Hernandez's letter, which

2  merely echoed Plaintiff's subjective complaints, was harmless.

3  **VI.  Plaintiff's Depression**

4  The ALJ did not include depression as one of Plaintiff's severe impairments, concluding

5  that she was not diagnosed with depression until December 2007, when Dr. Sabian prescribed

6  Effexor in response to Plaintiff's complaints of depression and anxiety.  Citing to AR 286,

7  Plaintiff counters that the ALJ erred since Dr. Sabian first diagnosed Plaintiff with depression on

8  July 6, 2006.  Plaintiff is incorrect.  Although the top entry on AR 286 is dated July 6, 2006, Dr.

9  Sabian's diagnosis of depression and prescription of Effexor is within an entry lower on the page

10  that is dated November 1, 2007.

11  **IV.  Conclusion and Order**

12  For the reasons discussed above, this Court hereby AFFIRMS the agency's determination

13  to deny Plaintiff disability benefits.  The Clerk of Court is directed to enter judgment for

14  Defendant Michael J. Astrue, Commissioner of Social Security.

15

16  IT IS SO ORDERED.

17  **Dated:    June 27, 2012**                                  **/s/ Sandra M. Snyder**
                                                              UNITED STATES MAGISTRATE JUDGE
18

19

20

21

22

23

24

25

26

27

28